IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| RAFAEL AMELLER | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RWT 10-CV-3390 |
| MIHAI A. VINATORU, et al. | * | |
| Defendants/Third-Party Plaintiffs | * | |
| v. | * | |
| GERALD GROH, JR. | * | |
| Third-Party Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANTS/THIRD-PARTY PLAINTIFFS' OPPOSITION TO
THIRD-PARTY DEFENDANT GERALD RUSSELL GROH, JR.'S
MOTION FOR SUMMARY JUDGMENT**

Defendant/Third-Party Plaintiffs, Mihai A. Vinatoru, and Vinatoru Enterprises, Inc., by and through their attorneys, Thomas V. McCarron and Semmes, Bowen, & Semmes, respectfully submit their Opposition to Third-Party Defendant Gerald Russell Groh, Jr.'s Motion for Summary Judgment, and for cause state as follows:

## I.   INTRODUCTION

This is an automobile negligence case, which arises from an automobile accident on the inner-loop of Interstate 495 (the "Capital Beltway") immediately prior to the Capital Beltway's split with Interstate 95. On November 3, 2010, Plaintiff, Rafael Ameller ("Ameller"), filed a Complaint against Defendants/Third-Party Plaintiffs (hereinafter collectively, "Vinatoru"), alleging that Vinatoru negligently operated his automobile and caused the accident. On April 7,

2011, Vinatoru filed a Third-Party Complaint against Third-Party Defendant, Gerald Russell Groh, Jr. ("Groh"), alleging that Groh caused or contributed to the accident.

Varying accounts of the accident have been provided by the parties and four eye witnesses. (*See* Section II, *supra*). Indeed, all of the parties and witnesses tell a materially different story as to how the accident unfolded. (*See id.*). Furthermore, the physical evidence in this case, including photographs of the damage (or lack thereof) to the vehicles, only serves to compound the factual questions surrounding the accident. (*See* Section II(8), *supra*). Therefore, this is a case involving a number of material factual disputes, which only a jury can unravel and which lead to multiple reasonable inferences.

One of the reasonable inferences that a jury could draw from the testimony and the physical evidence is that the accident occurred because Groh, the Third-Party Defendant, negligently operated his automobile when he suddenly and without warning made an unsafe lane change into the far right lane. (R. Ameller Dep. at p. 55, attached as Ex. 1). The jury could conclude that in doing so, Groh struck Ameller's vehicle, which was traveling alongside Groh, and caused Ameller to spin off of the Capital Beltway. (*Id.*). A jury could also reasonably conclude that Vinatoru was not involved in the accident in any way, and that fault for the accident rests entirely on Groh or, a reasonable jury could conclude that Groh contributed to the accident by approaching or positioning himself alongside the Vinatoru vehicle after it had begun its lane change. (*See id.*). Since a reasonable jury could infer from the testimony and physical evidence that Groh negligently caused or contributed to Ameller's injuries, this Court should not grant summary judgment in Groh's favor.

## II.    FACTS

As described above, the parties are Ameller, Vinatoru, and Groh. Three of the four witnesses are additional motorists who were driving somewhere behind the accident. These witnesses are Mr. Lawrence Egan Serrell ("Serrell"), Mr. David Gertz ("Gertz"), and Ms. Tessa Carter ("Carter")[1]. The final witness is Mr. Adam Alb ("Alb"), who was a passenger in Vinatoru's vehicle. (A. Alb Dep. at p. 51, attached as Ex. 2). Each of the parties and witnesses have provided a materially different version of the events that caused or contributed to the automobile accident, creating a material dispute of fact as to which party was truly at fault or whether multiple parties were at fault. (*See* Section II(1)-(6), *supra*).

The only undisputed facts, and there are few, are as follows. All of the parties were traveling on the inner-loop of the Capital Beltway just prior to the Interstate 95 North Exit. (G. Groh Dep. at p. 16, attached as Ex. 4). At the location of the accident, the Capital Beltway is five lanes wide, the right two of which become exit lanes to the Interstate 95 North Exit. (*Id.* at pp. 17-18). For convenience, lane one is the far left lane and lane give is the far right lane with the middle lanes from left to right being numbered two through four. From lane four, a motorist may elect to continue on the Capital Beltway or exit onto Interstate 95 North (*Id.*). Ameller was driving a silver Hyundai ("Hyundai") (Ex. 1 at p. 42); Groh was driving a gray Ford F-150 pickup truck ("pickup truck") (Ex. 4 at p. 14); and Vinatoru was driving a large yellow Penske box truck ("Penske truck"). (M. Vinatoru Dep. at p. 33, attached as Ex. 3). At the time of the accident, all of the vehicles were in the same general vicinity of each other. (Ex. 4 at pp. 36, 43, & 49-50).

It is also undisputed that Groh's pickup truck made contact with Ameller's Hyundai (though responsibility for that contact is very much the heart of the dispute), which caused

---

[1] Ms. Carter was just deposed and her transcript is not yet available.

Ameller's vehicle to lose control, veer off the right side of the Capital Beltway and roll over. (Ex. 4 at pp. 49-50). Ameller, Groh, and Vinatoru all stopped at or near the scene, as did the three other drivers who witnessed the accident. (*Id.* at 33, 35, & 36).

The remainder of the facts- including who caused or contributed to the accident- are disputed by the various accounts of the respective parties and witnesses. (*See* Section II(1)-(6), *supra*). The parties have also taken pictures of the damage to both the Penske truck and the pickup truck. (Photographs of the Penske truck, attached as Ex. 7; Photographs of the pickup truck, attached as Ex. 8). The photographs of the pickup truck show damage to the driver's side of the pickup truck, while the photographs of the Penske truck do not show any damage to the passenger side of the Penske truck. (*See Id.*). The account given by each party and witness, and the details of the photographs are as follows:

### 1. Plaintiff, Rafael Ameller:

Ameller's version of the accident alone gives rise to a permissible inference that Groh caused the accident. (*See* Ex. 1). Ameller contends that he was traveling in lane five immediately prior to the accident. (*Id.* at p. 46). Ameller contends that, as he was traveling, he gained on the Groh pickup truck, which was traveling in lane four. (*Id.* at p. 52). Suddenly, Groh's pickup truck jerked to the right and collided with Ameller's Hyundai. (*Id.* at p. 55). According to Ameller, at the time of the accident, the pickup truck was slightly ahead of the Hyundai and the rear passenger side of the pickup truck struck the driver's side of the Hyundai around the front wheel. (*Id.* at p. 56).

When the accident occurred, Ameller did not even see a Penske truck and he did not testify that the Penske truck was responsible for the accident. (*Id.* at p. 57). Specifically, Ameller stated in his deposition:

> Q. Now, prior to the pickup truck jerking to the right in the manner you've described, did you see anything in terms of what caused that pickup truck to jerk to the right?
>
> A. No, I did not.
>
> Q. There is in this case an allegation that a Penske pickup -- strike that, a Penske truck changed lanes into the pickup truck. Did you see that occur at all?
>
> A. No, I did not.
>
> Q. Did you even notice a Penske truck, big yellow box truck in the vicinity where the accident happened?
>
> A. I did after the accident.
>
> Q. But not at any time before?
>
> A. No.

(*Id.* at 57-58). Mr. Ameller went on to state:

> Q. You're not able to attest or testify that anything my client did caused this accident, my client being Mr. Vinatoru?
>
> . . .
>
> You're not able to attest to anything from your own personal observations that my client did to cause this accident?
>
> . . .
>
> Am I correct about that?
>
> A. You're correct.
>
> Q. And you didn't notice a big yellow Penske truck of the sort that we have marked or photographed in Alb Exhibit No. 1 driving along the roadway at any time before the accident?
>
> A. No.

(*Id.* at 58). Mr. Ameller also stated that he did not hear a collision (*e.g.* between the Vinatoru Penske truck and the Groh pickup truck) prior to the Groh pickup truck striking Ameller's driver's side. (*Id.* at 59).

Particularly given the size and yellow color of the Penske truck, Ameller's testimony that Groh changed lanes without involvement of a rather conspicuous box truck gives rise to a permissible inference that the sole cause of the accident was Groh's sudden jerk into lane five, which struck Ameller's vehicle. (*See* Ex. 7).

### 2. Defendant/Third-Party Plaintiff Mihai A. Vinatoru

Vinatoru's testimony also implicates Groh's pickup truck as the vehicle that caused or at least contributed to the accident. (*See* Ex. 3). Immediately prior to the accident, Vinatoru was traveling at approximately fifty miles per hour in lane three. (*Id.* at pp. 62 & 74). Just before the accident, Vinatoru decided to change lanes to lane four, so that Vinatoru could exit onto Interstate 95. (*Id.*). Prior to changing lanes, Vinatoru continued his speed at fifty miles per hour, glanced in his side-view mirror, saw that traffic was safely and sufficiently behind him, properly signaled, and gradually changed from lane three to lane four. (*Id.* at p. 66). As Vinatoru was almost completely in lane four, he heard a loud bang that did not involve his own truck. (*Id.* at p. 75-76). After he heard the bang, Vinatoru looked in his side-view mirror and saw the pickup truck coming up from behind him, faster than the speed at which Vinatoru was traveling, which Vinatoru estimated to be fifty miles per hour. (*Id.* at pp. 62 & 75-76). Vinatoru also saw the Hyundai spin off of the side of the Capital Beltway. (*Id.*).

Vinatoru contends that he never felt any contact with Groh's pickup truck and that Groh was solely responsible for the accident. (*Id.* at p. 86). At the time that Vinatoru heard the collision, Vinatoru testified that he was approximately three feet in front of Groh's pickup truck.

(*Id.*). In fact, Vinatoru explicitly stated, "What is fair to say is that I -- I did not hit anything with the [Penske] truck." (*Id.* at p. 87). Vinatoru then reiterated, "My -- my car did not hit anybody's truck." (*Id.* at p. 88).

### 3. Witness Adam Alb

Alb, the passenger in Vinatoru's Penske truck, gives a similar account of the accident as Vinatoru. (*See* Ex. 2). Alb was riding in the passenger seat of the Penske truck, looking forward through the windshield at the time of the accident. (Ex. 2 at p. 49). Alb testified that he remembered that Vinatoru changed lanes prior to the exit for Interstate 95 and, before the lane change, Alb looked in the side view mirror and did not see the pickup truck. (*Id.* at p. 49). Then, Vinatoru signaled and initiated a gradual lane change. (*Id.* at p. 45 & 48). Once Vinatoru changed lanes, Alb heard a bang that sounded like a collision between the other vehicles. (*Id.* at p. 50). After Alb heard the collision, Alb looked in the side view mirror and saw both the pickup truck and the Hyundai fish-tailing. (*Id.* at p. 51-53).

Alb also contends that the Penske truck never made contact with the pickup truck, and that Vinatoru was not responsible for the accident. In his deposition, Alb stated:

> Q. The International box truck that you were riding in, did it make contact with any other vehicle?
>
> A. No. No.

(*Id.* at p. 12). Instead, Alb contends that the entire accident occurred when the pickup truck struck the Hyundai and sent it out of control. (*See id.* at pp. 51-53).

### 4. Third-Party Defendant Gerald Russell Groh, Jr.

Contrary to both Ameller and Vinatoru, Groh contends that Vinatoru struck Groh's pickup truck, which caused Groh to collide with Ameller. (*See* Ex. 4). Immediately prior to the

accident, Groh contends that he was traveling on the Capital Beltway towards the exit to Interstate 95 in lane four. (*Id.* at p. 36). Groh contends that prior to the exit for Interstate 95 North, the Penske Truck (which Groh did not see until the point of the collision) started coming from lane three into lane four, which was the lane in which Groh was traveling. (*Id.* at p. 42). At that point, the Penske truck struck Groh's pickup truck on the driver's side, causing Groh's pickup truck to bounce toward and collide with Ameller and then back into the Penske truck a second time.[2] (*Id.*). Ameller's Hyundai was traveling in lane five, side-by-side with Groh's pickup truck. (*Id.* at p. 45) When Groh's pickup truck bounced off the Penske truck into lane five, Groh's pickup truck struck the Hyundai and forced it into the ditch on the side of the Capital Beltway. (*Id.*).

### 5.   Witness Lawrence Egan Serrell

Serrell implicated Ameller as the driver at fault for the accident. (*See* L. Serrel Dep., attached as Ex. 5). Serrell contends that the only vehicles he saw make contact were Groh's pickup truck and the Hyundai. (Ex. 5 at p. 13). Serrell testified that he witnessed the Hyundai attempt to change from lane four to lane three, but clip the rear of the pickup truck in the process. (*Id.* at p. 23).

Serrell testified that he was traveling in the far right lane, lane five, when he witnessed the accident. (*Id.* at p. 13). Before the accident, Serrell witnessed the Hyundai come up from behind Serrell and pass on his left. (*Id.* at p. 14). According to Serrell, the Hyundai was traveling above the 55 miles per hour posted speed limit. (*Id.* at pp. 16-17). Serrell then witnessed the Hyundai change lanes and move to lane three. (*Id.* at p. 19). At this point, Serrell

---

[2]Notably, Groh's deposition testimony- that there were two collisions between his pickup truck and the Penske truck- is different than his testimony in traffic court. (*See* Traffic Court Transcript at p. 3, attached as Ex. 9). In traffic court, Groh testified to only one collision between his pickup truck and the Penske truck. (*Id.*).

described the Hyundai as weaving in between cars to move through traffic. (*Id.* at p. 18). When the Hyundai was fully in front of Serrell, Serrell witnessed it approach the rear of the pickup truck in lane three. (*Id.* at p. 20). As the Hyundai approached the rear of the pickup truck, it switched to lane four and then quickly back into lane three. (*Id.* at 23). When the Ameller Hyundai was moving back into lane three, however, it clipped the pickup truck from behind and spun out of control. (*Id.* at p. 23).

Serrell described the Hyundai's actions immediately prior to the accident essentially as an attempt to weave through moderate to heavy traffic on the Capital Beltway. (*Id.*). While weaving through traffic, Serrell testified that the Hyundai caused a collision with the pickup truck. (*Id.*). Specifically, Serrell stated:

> The little car can't make it over to the second most right lane, so he tries to go back into -- not back into. He's kind of -- he's kind of half in the third lane, half in the [fourth] lane. And if he goes all the way over to the [fourth] lane, it's going to be door to door with another vehicle there, so he tries to go back over to the third lane rather than doing the collision in the [fourth] lane and they just -- the front of the little car's bumper clips the rear passenger side of the truck.

(*Id.*).

Notably, Serrell does not contend that any Penske truck was involved in the accident in any manner. (*Id.* at p. 41). With regard to Vinatoru, Serrell stated:

> Q. Other than the pickup and the little vehicle, did you see any other vehicles on the roadway that were involved meaning vehicles that had contact with either the little car or the pickup truck?
>
> A. No.
>
> Q. Specifically do you recall seeing a Penske truck involved in this accident or in the vicinity of where the accident occurred?
>
> A. No.

(*Id.*).

Serrell did, however, testify that after Groh's collision with Ameller, Groh's pickup truck suddenly swerved to the left (*i.e.*, toward the direction of where other witnesses would, at some point, have placed the Vinatoru Penske truck). (*Id.* at 28). According to Serrell's testimony, prior to the collision, Groh's pickup truck was in lane three. (*Id.*). After the collision, however, Groh's pickup truck bounced off the Hyundai and shifted into lane two. (*Id.*).

### 6. Witness David Gertz

Gertz tells a similar story to that of Serrell, though Gertz's testimony differs from Serrells in that Gertz describes the Hyundai as striking the side of the pickup truck and not clipping it from behind. (*See* D. Gertz Aff., attached as Ex. 6). Gertz also describes the accident as occurring in different lanes than Serrell. (*See id.*).

According to Gertz, just prior to the accident, the Hyundai was traveling approximately 85-90 miles per hour and passed Gertz on the left. (*Id.* at ¶ 4). The Hyundai was in lane one when it passed Gertz. (*Id.*). After the Hyundai passed Gertz, it abruptly changed from lane one (far left lane) all the way to lane four. (*Id.* at ¶ 5). At this point, the Hyundai approached the pickup truck from behind. (*Id.*). Then, the Hyundai suddenly swerved into lane five. (*Id.* at ¶ 6). Before arriving fully in lane five, the Hyundai swerved back to the left and struck the pickup truck squarely on the passenger side. (*Id.* at ¶ 7). At that point, the Hyundai lost control and started to roll off the Capital Beltway. (*Id.* at ¶¶ 8 - 9).

Like Serrell, Gertz does not describe a Penske truck as being at fault in the accident. (*See id.*). Indeed, like Serrell, Gertz does not even mention that a Penske truck was around the accident. (*See id.*). Gertz only describes the collision between the Hyundai and the pickup truck, which was caused by the Hyundai. (*See id.*).

### 7. Witness Tessa Carter

Carter was just deposed. Her deposition transcript is not yet available, but it is conceded that her testimony does not implicate Groh.

### 8. Photographs

Like the parties and the witnesses, the photographs of the damage to the respective vehicles tells different and conflicting stories. (*See* Exs. 7 & 8). There are photographs of both the damage (or lack thereof) to both the Penske truck and the pickup truck. (*Id.*). The photographs of the Penske truck do not show any damage whatsoever to the passenger side of the truck. (Ex. 7). The photographs also do not show any paint markings from the pickup truck anywhere on the Penske truck. (*Id.*).

The photographs of the pickup truck, on the other hand, show that the driver's side of the pickup truck is damaged. (Ex. 8). The photographs of the pickup truck only show that the driver's side of pickup truck was damaged at some point, perhaps when the pickup swerved to the left, as Serrell attested, after its collision with Ameller, certainly a reasonable inference that the jury could draw. (*Id.*).

Both the testimony and the physical evidence lead to different inferences as to how the accident happened; whether it be that Ameller, Groh, or Vinatoru were at fault for the accident, or that one or more of them contributed to the accident.

## III.   LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). In

considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The substantive law identifies which facts, or inferences therefrom, are material and also identifies the standard of proof against which the presence or absence of a material factual dispute is to be gauged. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law, and is akin to a directed verdict inquiry. *Id.* at 323. In considering a motion for summary judgment, the court is to take all of the facts and inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

It is well established that summary judgment should not be granted where conflicting inferences may be drawn from the evidence in a case, or if reasonable men might differ as to the conclusions drawn from the evidence. *Batchelor v. Legg & Co.*, 52 F.R.D. 545, 547 (D. Md. 1971). The "burden is upon the party moving for summary judgment to demonstrate clearly that there is no genuine issue of fact, and any doubt as to the existence of such an issue is resolved against him." *Id.*

### IV. <u>ARGUMENT</u>

Summary judgment is not appropriate in this case because there are six accounts of the accident. (*See* Section II, *supra*). This case presents the very essence of a factual dispute between multiple parties and witnesses and creates a number of reasonable inferences that a jury could draw, some of which implicates Groh. From the testimony and the physical evidence, a

reasonable jury could reasonably infer that: (1) Groh negligently operated his automobile when he made an unsafe lane change and struck Ameller's vehicle; (2) that after Groh struck Ameller's vehicle he swerved into Vinatoru's lane and struck Vinatoru or some other vehicle; and/or (3) that Groh negligently approached Vinatoru's vehicle and struck the Ameller vehicle and/or the Vinatoru Penske truck after Vinatoru had signaled, at a time when it was traveling fifty miles per hour and had nearly completed a gradual lane change. Furthermore, the jury could reasonably conclude that Vinatoru was not at fault for the accident, in any way. These reasonable inferences are supported by the testimony of Ameller, Vinatoru, Alb, and the photographs of the Penske truck. (*See* Section II, *supra*).

In his Motion for Summary Judgment Groh even concedes, as he must, that Vinatoru and Alb's testimony implicates Groh as the negligent party, especially in that Groh negligently comes upon the Penske truck from behind and initiates contact.[3] (*See* Mot. at p. 1). Groh even stated that Vinatoru and Alb both testify that Groh was negligent in the operation of his automobile. (*Id.*). If a jury concludes that Vinatoru and Alb's version of the accident accurately depicts the sequence of events then the jury could reasonably find Groh liable. On those facts alone, this Court should deny Groh's Motion for Summary Judgment, as there is a reasonable factual dispute.

A jury could also reasonably infer that Groh was negligently operating his automobile by speeding and quickly coming upon the rear of the Penske truck. Judgment as a matter of law is inappropriate where differing reasonable inferences can be drawn from the evidence as to which

---

[3] Groh contends that it is clear that Vinatoru and Alb are fabricating their testimony and that their testimony is nonsensical. (Mot. at pp. 1-2). The law is clear, however, that on a Motion for Summary Judgment this Court should not assess the credibility of the witnesses. *Ecology Serv., Inc. v. Granturk Equip., Inc.*, 443 F. Supp.2d 756, 771 (D. Md. 2006).

vehicle is negligent in an automobile accident between two vehicles proceeding in the same direction. *See Palmer Ford, Inc. v. Rom*, 216 Md. 165, 169-70 (1958). In *Palmer*, the Court of Appeals assessed whether a directed verdict should have been granted against the Plaintiff, the driver of a vehicle making a left hand turn, who's truck was struck by a vehicle attempting to overtake the Plaintiff on his left. *Id.* Testimony revealed that there was a factual dispute as to whether the Plaintiff in the turning vehicle properly signaled and whether he should have seen the Defendant's vehicle overtaking the Plaintiff's when the Plaintiff checked his mirrors. *Id.* The Court concluded that a jury could reasonably return a verdict in favor of the Plaintiff in the turning vehicle because the jury could reasonably infer that the Plaintiff had properly signaled and partially established himself in the lane to his left prior to the collision. *Id.* The jury could also reasonably infer that the Defendant in the overtaking vehicle had failed to operate his vehicle at a safe speed and heed the turning vehicle's signals. *Id.* Therefore, the Court of Appeals affirmed the trial court's refusal to grant a directed verdict against the Plaintiff because issues of primary and contributory negligence were for the jury. *Id.*

In the instant case, a jury could likewise find that Groh negligently operated his automobile by speeding in lane four and failing to heed Vinatoru's turn signal and gradual safe lane change. According to Vinatoru's testimony, Vinatoru glanced in the side view mirror of the Penske truck before changing lanes and did not see Groh's pickup truck. (Ex. 3 at p. 66). Vinatoru testified that he then signaled and safely and gradually changed lanes. (*Id.*) After Vinatoru changed lanes, Vinatoru and Alb both heard a loud bang, not involving their own vehicle. (*Id.* at pp. 75-76; Ex. 2 at p. 50.) It was not until after they heard that bang that both Vinatoru and Alb saw Groh's pickup truck coming up behind them in the side view mirror and the Hyundai spinning out of control. (*Id.*). This testimony can lead to the reasonable inference

that Groh was traveling faster than the speed of the Penske truck estimated by Vinatoru to be fifty miles per hour, approached the Penske truck from behind, and negligently initiated contact with Ameller and/or the Penske truck. (*Id.* at pp. 62 & 75). It is a reasonable inference for the jury that Groh who was traveling faster than the Penske truck, was not present beside the Penske truck when Vinatoru began his gradual lane change traveling fifty miles per hour, all the while using his right turn signal. (*Id.* at pp. 75-76).

Ameller's testimony also supports the reasonable inference that Groh made an unsafe lane change and negligently struck Ameller's Hyundai. Drivers have a statutory duty to only change lanes when safe to do so and permitted by traffic signals. MD. CODE ANN. TRANSP. § 21-604.[4] A jury could reasonably find that Groh negligently made an unsafe lane change into Ameller and that Groh caused or contributed to the accident. In his Motion for Summary Judgment, Groh incorrectly stated that, "none of the other known witnesses (including Plaintiff Ameller) blame Groh (in any way) for causing or contributing to the accident at issue in this case." (Mot. at p. 1). To the contrary, Ameller described the accident as occurring when Groh's pickup truck crosses into Ameller's lane and strikes the driver's side of Ameller's vehicle; irrespective of the Penske truck. (Ex. 1 at p. 55). Ameller testified:

> Q. Can you describe [the pickup truck's] movements?
>
> A. It jerked its way into my lane. It was a sudden movement to the left – to the – excuse me. A sudden movement to the right.
>
> Q. A sudden movement from the pickup truck's perspective to its right into your driver's side?
>
> A. Yes.

---

[4] A violation of a statute is evidence of negligence. *In re Sabin Oral Polio Vaccine Prod. Liab. Litig.*, 774 F. Supp. 952, 956 (D. Md. 1991).

(*Id.*)

In Ameller's deposition, Ameller explicitly stated that he never saw the Penske truck, either before the accident or after the accident. (*Id.* at p. 57). With regard to the Penske truck, Ameller testified:

> Q. There is in this case an allegation that a Penske pickup – strike that, a Penske truck changed lanes into the pickup truck. Did you see that occur at all?
>
> A. No, I did not.

(*Id.* at p. 57). A reasonable jury could conclude that the reason Ameller noticed no big, yellow and rather conspicuous Penske truck ,and neither heard nor witnessed any prior collision between the Groh and Vinatoru trucks, was because the Vinatoru truck was not involved in causing the Groh vehicle into Ameller's lane. The jury could conclude that the only reason that Groh unexpectedly swerved into Ameller's lane, as Ameller states, was because Groh was negligently operating his automobile and undertook an unsafe lane change. Based upon this reasonable inference, this Court should not grant summary judgment in favor of Groh.

In his Motion for Summary Judgment, Groh also incorrectly states that the physical evidence shows that "the left side of the [pickup truck] came into contact with a vehicle consistent with the [Penske truck]." (Mot. at p. 5). In making this assertion Groh ignores the photographs of the Penske truck- which do not show any damage to the passenger side of the Penske truck- and Serrell's testimony that Groh swerved to the left *after* the initial collision with the Hyundai. (Ex. 7; Ex. 4 at p. 28). Serrell testified that after that collision between Groh and Ameller, Groh's pickup truck bounced off of Ameller's Hyundai and swerved one lane to Groh's left. (*Id.*). The jury could reasonably infer from the evidence that the damage to Groh's pickup truck only occurred after the collision between Groh and Ameller, whoever as between Groh and

Ameller made a lane change causing that collision, and after Groh thereafter swerved toward Vinatoru's truck.

When taken in the light most favorable to Vinatoru, the nonmoving party, the evidence supports the reasonable conclusion that Groh negligently operated his automobile by crossing into lane five and striking the driver's side of Ameller's vehicle. A jury could reasonably assign liability to Groh. Additionally, the jury could consider that the photographs of the Penske truck do not show any damage to the Penske truck, that Groh and Vinatoru made no contact at all or conclude that any contact between the Penske truck and the pickup truck was minor and occurred after the initial collision between the Ameller and Groh vehicles.

## IV.  CONCLUSION

This case can only be resolved by a jury. Summary judgment is not appropriate in this case, since a jury could draw a number of reasonable inferences from the evidence, one of which is that Groh negligently operated his automobile thereby causing or contributing to this accident. Therefore, this Court should deny Groh's Motion for Summary Judgment.

/s/ Thomas V. McCarron
Thomas V. McCarron
Federal Bar #: 08145
Semmes, Bowen & Semmes
25 S. Charles Street, Suite 1400
Baltimore, Maryland 21201
tmccarron@semmes.com

*Attorneys for
Defendant/Third-Party Plaintiffs
Mihai A. Vinatoru and
Vinatoru Enterprises, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of July, 2011, a copy of the foregoing Opposition to Third-Party Defendant's Motion for Summary Judgment and proposed Order was filed and served *via* CM-ECF Electronic Filing System and electronic mail to:

Peter C. Grenier, Esquire
Bode & Grenier, LLP
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, D.C. 20036

Attorneys for Plaintiff

and

Edwin N. Staples, II, Esquire
Council, Baradel, Kosmerl & Nolan, P.A.
125 West Street, 4th Floor
P. O. Box 2289
Annapolis, Maryland 21404-2289

Attorneys for Third-Party Defendant

                                                   */s/ Thomas V. McCarron*
                                                   Thomas V. McCarron (08145)

B1128343.WPD